## ARMSTRONG vs. POTTS.

1. An injunction will not be dissolved or refused upon new matter set up in the answer, not responsive to the bill.

2. An agreement between two proprietors upon the same stream, that the upper proprietor shall have the right to discharge all the waters drawn from a canal feeder over the lands of the lower proprietor, and that the lower proprietor shall be entitled to have all the waters drawn from the feeder flow over his lands, entitles the lower proprietor to the flow of all the water actually drawn from the feeder, although in excess of the quantity which the upper proprietor has the legal right to draw from the feeder.

This was a motion to dissolve an injunction heretofore granted, made upon the answer of the defendant.

*Mr. J. C. Potts*, for motion.

*Mr. J. Wilson* and *Mr. Richey*, contra.

THE CHANCELLOR.

The Delaware and Raritan Canal Company, in the year 1832, constructed the feeder for its canal through the city of Trenton. In doing this the company took lands of William Potts, under whom the defendant, William H. Potts, derives title, and in passing through his land stopped the flow of a great part of the water of Petty's run, a stream which passed through his land and through lands of others, and emptied into the Delaware. This stream was used for water power on the lands of Potts and of some others of these owners. The company, to restore to Potts the water thus taken away, permitted him to construct a trunk from the feeder, by which water was taken to turn the wheel of his mill. This water was supplied in greater quantities than the natural flow through Petty's run, and some of the owners below, who did not use it for water power, and were injured by the excess of water, brought suits for the injury. In August, 1848, an agreement was made between these owners and Potts to com-

promise these suits and settle the difficulties between them. There were six parties to this agreement, including all the owners of land between the feeder and the Delaware. Henry P. Welling, under whom the complainant, Armstrong, derives title, was one of these parties. By this agreement Potts granted to each of the other parties and his heirs and assigns the right of flowing the water drawn from the feeder, as the same was then done, over his lands along and under Petty's run; and he covenanted with them that he and his heirs and assigns would keep open, and suffer them to keep open, the gate or gates at his upper tan-yard, so as to permit the water to be drawn from the feeder to flow through, and best promote the beneficial use of it at the several mills upon the stream.

At the date of this agreement there was a trunk constructed from the feeder to the mill, on Potts' upper tan-yard; from this there were two gates—one to let the water on the mill-wheel, called the wheel-gate, and another called the side-gate, at one side of the wheel, which was opened to let down the water when the wheel-gate was closed, so that the owners of the lands and mills below should have the constant use and benefit of the flow of the water through their premises.

Each of the other parties granted to Potts, and to each other, the right of flowing the water drawn from the feeder over his lands along Petty's run.

To this agreement, which was under seal, there was appended a written memorandum, signed by three of the parties, William Potts, Isaac Dunn, and H. P. Welling, by which they agreed that the trunk, from the feeder to the head-race at Potts' upper yard, should be repaired, kept up, and maintained at their joint expense.

From the date of this agreement to the interference complained of in 1869, the water which flowed from the feeder in the trunk thus constructed, had been permitted to pass down Petty's run through the two gates mentioned; the side-gate being raised when the wheel was stopped and the wheel-gate closed. The complainant, who had purchased the lands

and mill of Welling, and had enlarged the mill and works, was permitted to place an automatic mechanical contrivance at these gates by which the closing of the wheel-gate opened the side-gate, which was again closed when the wheel-gate was opened.

The complainant having refused to pay some claim made by the defendant for repairs, the latter closed the side-gate and refused to allow the complainant to open it, thus depriving him of the benefit of the water drawn from the feeder, except at such times as the wheel-gate was open.

These facts stated in the bill are not denied by the answer, except that it is denied that the closing of the side-gate, or any other act of the defendant, intercepts the flow of all the water. The answer states that a flow of water equal to sixty-four square inches drawn under a head of four feet, has not been stopped or intercepted, but has constantly been permitted. The answer further sets up that the water was drawn by virtue of agreements with the canal company—one of which was with William Potts, and the other with Garret D. Wall through whom the complainant derives title—that the water to be drawn from the feeder was to be the quantity of sixty-four square inches, drawn under a head of four feet; and that the complainant has no right to have any more water flow to his land from the feeder than this quantity.

In the first place, these agreements are set up in the answer not in response to the bill, but in avoidance, and in limitation of the rights claimed in it; and by the settled practice of this court, an injunction will not be dissolved or refused upon new matter set up in the answer not responsive to the bill. This was so held by Chancellor Green in *The Society* v. *Low*, 2 *C. E. Green* 26; by Chancellor Williamson in *Green* v. *Pallas*, 1 *Beas.* 267; and in *Butler* v. *The Society, Ib.* 264; in which case on appeal, (*Ib.* 506,) the doctrine was recognized in the Court of Appeals in the opinion of the court delivered by Green, C. J. Chancellor Kent so held in *Minturn* v. *Seymour*, 4 *Johns. Ch.* 499, citing as authority *Allen* v. *Crabcroft, Barnardist. Ch. R.* 373.

But if these agreements were properly before the court,

they cannot qualify the agreement of August 5th, 1848, upon which the question here depends. That agreement was not for flowing the water which the parties were *entitled to draw*, but "the *water drawn* from the feeder." This must mean either the water drawn by the trunk as it then was, or the water that should at any time be drawn from the feeder. This has always been in excess of sixty-four square inches. It may be that the company has the right to restrict the water drawn from the canal to sixty-four inches under the given head. If it has that right and does withhold all over that amount, the complainant has no claim against Potts for this. But when the company allows more water to be drawn, and it is drawn, the complainant has by this grant a right to have the amount actually drawn flow over the land of Potts, and through one of the two gates, to his mill. Potts has the corresponding right; if he draws four hundred instead of sixty-four square inches from the feeder, he has the right to pass it over the complainant's lands to the Delaware. This was one of the main objects of the agreement which contains the grant. Some of the parties had agreements with the company, others had none. It cannot be supposed that such as had none intended to subject their lands to a burden and gain no right in return. The plain intent, as gathered both from the words of the agreement and from the circumstances under which it was made, was to give all the lower owners the right to have all the water drawn from the feeder pass through these gates, as the same was done at the date of the agreement—that is, by having one of the two gates always open; and on the other hand, to give Potts the right to pass all the water drawn by this trunk from the feeder away from his lands in like manner. It was not intended to confine the quantity to sixty-four inches or any other limit.

If it did not appear in what manner these gates were kept open at the date of the agreement, the provision that they were to be used in such manner as would best promote the beneficial use of it at the mills, would require one gate to be always open.

The motion to dissolve must be denied.